UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONROE COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>THE SIMPLY GOOD FOODS COMPANY, GEOFF E. TANNER, SHAUN P. MARA, and CHRISTOPHER J. BEALER,<br><br>Defendants. | Civil Action No. 1:26-cv-6971<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Monroe County Employees' Retirement System ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of The Simply Good Foods Company ("Good Foods" or the "Company"), the Company's press releases, analyst reports, media reports, and other publicly disclosed information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of Good Foods common stock between October 24, 2024 and April 8, 2026, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") against Good Foods and certain of the Company's executive officers.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

3. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and §27 of the 1934 Act, because the company acquired by Good Foods that is the focal point of this litigation, Only What You Need, Inc. ("OWYN"), is headquartered in this District and certain of the events or omissions giving rise to the claims at issue occurred in this District, including the dissemination

of the statements alleged to be materially false and misleading into this District, and the trading of Good Foods stock on a national stock exchange located within this District.

4. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

5. Plaintiff Monroe County Employees' Retirement System, as set forth in the certification attached hereto and incorporated by reference herein, purchased Good Foods common stock during the Class Period and has been damaged thereby.

6. Defendant Good Foods sells consumer packaged foods and snacking products under its various brands. Good Foods common stock trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "SMPL."

7. Defendant Geoff E. Tanner ("Tanner") served as Good Foods' President and Chief Executive Officer ("CEO") from July 2023 until his departure from the Company in January 2026. Tanner also served as a member of Good Foods' Board of Directors (the "Board") from April 2023 until January 2026.

8. Defendant Shaun P. Mara ("Mara") served as Goods Foods' Chief Financial Officer ("CFO") from October 2022 until his departure from the Company in July 2025. Prior to his role as CFO, Mara served at Good Foods' Senior Vice President of Strategy and Business Development.

9. Defendant Christopher J. Bealer ("Bealer") has served as Good Foods' CFO since July 2025. Bealer served as Good Foods' SVP Finance from April 2025 until he assumed the CFO position.

10. Tanner, Mara, and Bealer are collectively referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, customers, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

12. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade in New York, New York on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, customers, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Good Foods common stock would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class

Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

14. Good Foods develops and sells consumer packaged health foods and snacking products under its portfolio of brands that includes Quest, Atkins, and OWYN. The Company's products consist of protein bars, ready-to-drink ("RTD") protein shakes, and sweet and salty protein snacks and confectionary foods. Good Foods relies on a network of major retail channels for distribution such as grocery stores, club stores, and mass merchandisers.

15. On April 29, 2024, Good Foods announced an agreement to acquire OWYN for $280 million in an all-cash transaction ("Acquisition"). OWYN specializes in plant-based RTD protein shakes. At the time, Good Foods stated that the Acquisition offered several "compelling strategic and financial benefits," including the diversification of the Company's portfolio by increasing its "presence within the RTD shake segment." Tanner similarly stated that the Acquisition enabled Good Foods to reach a "new, incremental consumer segment," which he claimed "strengthen[ed] [the Company's] category leading presence with retail customers." The need to expand the Company's product offerings was particularly acute as it was battling long-term declines in its low-carbohydrate Atkins brand.

16. On June 13, 2024, Good Foods completed the Acquisition. Subsequently, defendants claimed that OWYN was being successfully integrated into the Company's operations. For example, speaking during an October 2024 earnings call, Tanner stated that the integration of

OWYN was "progressing as planned" and assured investors that he "remain[ed] confident" in the Company's ability to "effectively integrate OWYN." Tanner updated investors in October 2025, representing that the OWYN integration had been "largely completed" and "gone well." Defendants further claimed that positive market trends and the successful execution of the Company's strategic initiatives had buoyed its operations and financial results, including within its OWYN segment.

17. Unbeknownst to investors, however, the integration of OWYN into Good Foods had been an abject failure. Key managers fled the Company after the Acquisition. Good Foods attempted to remedy the personnel loss by imposing a layered organizational structure which would later be described as bloated and lacking in strategic cohesion. Product quality control issues – including the decision to switch to an inferior supplier of pea protein prior to the close of the Acquisition but implemented soon thereafter – negatively impacted sales and customer loyalty. As execution failures and increased management costs led to margin erosion, Good Foods began heavy discounting activities and cut brand support, compounding its sales problems. Just two years after the Acquisition, Good Foods would take a cumulative $200 million impairment on its OWYN assets – ***more than 70% of the purchase price***. By then, the architect of the Acquisition – Tanner – had ignominiously stepped down. His replacement, returning CEO Joseph Scalzo ("Scalzo"), belatedly admitted that, rather than "progressing as planned," the Acquisition had in fact fallen far short of expectations as a result of operational missteps, product quality issues, the loss of key personal, and strategic blunders made in connection with the integration.

18. As a result of these revelations, the price of Good Foods shares declined more than 70% from Class Period highs of more than $40 per share to less than $11 per share by Class Period end, causing investors to suffer substantial financial losses and economic damages.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

19. The Class Period begins on October 24, 2024. On that day, Good Foods issued a release reporting financial results for its fourth fiscal quarter and year ending August 31, 2024 ("4Q24 Release").[1] The 4Q24 Release stated that Good Foods' quarterly revenue increased to $376 million from $320 million in the prior year period. The 4Q24 Release further stated that Good Foods' adjusted EBITDA increased in the quarter to $78 million from $67 million in the prior year period. The 4Q24 Release quoted Tanner who represented that the integration of OWYN "[wa]s proceeding as planned."

20. That same day, Good Foods hosted a conference call with analysts and investors to discuss the Company's results for the fourth fiscal quarter and full year, which was hosted by Tanner and Mara. During his prepared remarks, Tanner highlighted Good Foods' integration of OWYN, representing that the integration was "progressing as planned" and that he "remain[ed] confident in [Good Foods'] ability to effectively integrate OWYN," stating:[2]

> Turning to OWYN. ***This brand continues to deliver on the potential we envisioned***. Retail takeaway in the measured and unmeasured channels is strong with both distribution and velocity growth. Assuming a full year of OWYN operations, Q4 and full fiscal year 2024 net sales and retail takeaway are relatively in line with each other.
>
> ***And it's not one customer or channel. OWYN growth has significantly accelerated across all major retail customers***. In the measured channel universe, OWYN is the third largest sports nutrition multipack brand in the US and growing the fastest in dollar sales.
>
> ***We remain confident in our ability to effectively integrate OWYN into our business and deliver on the acquisition model commitments***. In 2024, OWYN benefited from increased distribution into new customers. With solid ACV in fiscal

---

1 Good Foods' fiscal year ends on the last Saturday in August.

2 Emphasis added here and throughout unless otherwise noted.

> 2025, we expect POS growth of 20% to 30%, driven by higher velocities and increased items or SKUs at select retailers.
>
> As such, in fiscal 2025, we expect OWYN net sales to be in the $135 million to $145 million range, also a 20% to 30% increase versus the last year. ***The integration work is underway and progressing as planned***.

21. On October 29, 2024, Good Foods filed its annual report on Form 10-K with the SEC, which was signed by Tanner and Mara. Tanner and Mara also provided certifications attesting to the report's accuracy and completeness. The report highlighted the Acquisition, claiming Good Foods acquired OWYN as part of its strategic "vision" to "lead" the nutrition industry, stating:

> ***We acquired OWYN as a part of our vision to lead the nutritious snacking movement with trusted brands*** that offer a variety of convenient, innovative, great-tasting, better-for-you snacks and meal replacements that will now offer plant-based products to a wider market of consumers.

22. On January 8, 2025, Good Foods issued a release reporting financial results for its first fiscal quarter ending November 30, 2024 ("1Q25 Release"). The 1Q25 Release stated that Good Foods' quarterly revenue increased to $341 million from $309 million in the prior year period. The 1Q25 Release further stated that Good Foods' adjusted EBITDA increased in the quarter to $70 million from $62 million in the prior year period. The 1Q25 Release quoted Tanner who stated that Good Foods had implemented "strong marketing plans" to "support all" of the Company's brands, including OWYN.

23. That same day, Good Foods hosted a conference call with analysts and investors to discuss the Company's results for the first fiscal quarter, which was hosted by Tanner and Mara. During his prepared remarks, Tanner represented that Good Foods' integration of OWYN was "progressing as planned" and that the Company "continue[d] to be excited about the acquisition and the runway for sustained profitable growth." When asked by an analyst about the seeming early success of the Acquisition, Tanner responded:

> ***Very pleased with the acquisition, consumption, nearly 70% in Q1. And you know, notably you're seeing growth in both distribution and velocity. You don't normally see those two trend in the same direction but we are with OWYN***. As you know, the growth is coming from the core. And multi pack in particular has been a GAAP on the business that we have been working against, and we continue to drive additional doors on the business.

24. During the call, Mara represented that Good Foods was "reinvest[ing]" advertising spend in OWYN, as well as its Quest brand, as the Company reduced advertising for Atkins.

25. Also on January 8, 2025, Good Foods filed its quarterly report on Form 10-Q with the SEC. Tanner and Mara provided certifications attesting to the report's accuracy and completeness. The quarterly report contained the same financial information regarding Good Foods' revenue and adjusted EBITDA as stated in the 1Q25 Release. The report highlighted the Acquisition, claiming Good Foods acquired OWYN as part of its strategic "vision" to "lead" the nutrition industry, stating:

> ***We acquired OWYN as a part of our vision to lead the nutritious snacking movement with trusted brands*** that offer a variety of convenient, innovative, great-tasting, better-for-you snacks and meal replacements that will now offer plant-based products to a wider market of consumers.

26. On April 9, 2025, Good Foods issued a release reporting financial results for its second fiscal quarter ending March 1, 2025 ("2Q25 Release"). The 2Q25 Release stated that Good Foods' quarterly revenue increased to $360 million from $312 million in the prior year period. The 2Q25 Release further stated that Good Foods' adjusted EBITDA increased in the quarter to $68 million from $58 million in the prior year period.

27. That same day, Good Foods hosted a conference call with analysts and investors to discuss the Company's results for the second fiscal quarter, which was hosted by Tanner and Mara. During his prepared remarks, Tanner represented that Good Foods' integration of OWYN was "progressing well," stating:

> ***With continued velocity increases and our plan to add new doors, channels, flavors and pack sizes, we remain confident we can double net sales of the core business in the next three to four years. The integration is progressing well*** and with synergy capture starting at the onset of fiscal ’26, we are confident OWYN will deliver on its adjusted EBITDA margin target.

28. Mara added, “[o]n the positive side, as you said, we remain confident on . . . OWYN. We expect the benefit of a full year of productivity, as Geoff talked about, from synergies with the OWYN integration, both in the tens of millions of dollars.”

29. Also on April 9, 2025, Good Foods filed its quarterly report on Form 10-Q with the SEC. Tanner and Mara provided certifications attesting to the report’s accuracy and completeness. The quarterly report contained the same financial information regarding Good Foods’ revenue and adjusted EBITDA as stated in the 2Q25 Release. The report highlighted the Acquisition, claiming Good Foods acquired OWYN as part of its strategic “vision” to “lead” the nutrition industry, stating:

> ***We acquired OWYN as a part of our vision to lead the nutritious snacking movement with trusted brands*** that offer a variety of convenient, innovative, great-tasting, better-for-you snacks and meal replacements that will now offer plant-based products to a wider market of consumers.

30. On July 10, 2025, Good Foods issued a release reporting financial results for its third fiscal quarter ending May 31, 2025 (“3Q25 Release”). The 3Q25 Release stated that Good Foods’ quarterly revenue increased to $381 million from $335 million in the prior year period. The 3Q25 Release further stated that Good Foods’ adjusted EBITDA increased in the quarter to $74 million from $72 million in the prior year period. The 3Q25 Release quoted Tanner who highlighted Good Foods’ purported growth “‘framework,’” which he claimed included “‘award-winning marketing to build awareness of our brands,’” including OWYN.

31. That same day, Good Foods hosted a conference call with analysts and investors to discuss the Company’s results for the third fiscal quarter, which was hosted by Tanner and Bealer.

During his prepared remarks, Tanner represented that Good Foods' integration of OWYN was "nearly complete" and claimed that he and others "remain[ed] confident" in the Acquisition's ability to drive growth, stating in pertinent part as follows:

> ***At approximately 10% of our net sales today and with integration work nearly complete, we remain confident in our ability to drive strong double-digit growth. We have the team, capabilities, and insurgent mindset to enable OWYN to contribute to Simply's top and bottom-line growth for years to come***.

32. When asked about how OWYN had performed during the quarter and how OWYN was expected to impact the Company's fiscal 2025, Tanner responded, "[w]e remain very confident in the OWYN business and believe it has a very long runway of sustained growth." Tanner dismissed concerns around any perceived slowdown in OWYN's recent growth, stating, "we fully anticipated the deceleration in the second half." Tanner continued:

> It was always in our plans and reflected in our guidance. And the key driver here, I've said before, as we lap significant TDP gains, particularly at a large club and mass customer.
>
> ***And given when the brand and its maturity curve, though, we're very confident that distribution gains are going to reaccelerate. As we look into Q4, we have very clear line of sight to those gains coming over the summer and into the fall***. Q3 was just we were lapping a period when we didn't while we were lapping a sustained period of distribution growth from last year.

33. Bealer added:

> And maybe just to clarify, what ***I was saying is if you look at*** Quest and ***OWYN, recent consumption trends, we expect those to continue into FY26. So just to specify a couple of points. On OWYN in Q3, we had, let's call it, 24% – roughly 24% consumption growth. We'd expect something similar to that in FY26 on a full-year basis***.

34. Also on July 10, 2025, Good Foods filed its quarterly report on Form 10-Q with the SEC. Tanner and Bealer provided certifications attesting to the report's accuracy and completeness. The quarterly report contained the same financial information regarding Good Foods' revenue and adjusted EBITDA as stated in the 3Q25 Release. The report highlighted the

Acquisition, claiming Good Foods acquired OWYN as part of its strategic "vision" to "lead" the nutrition industry, stating:

> ***We acquired OWYN as a part of our vision to lead the nutritious snacking movement with trusted brands*** that offer a variety of convenient, innovative, great-tasting, better-for-you snacks and meal replacements that will now offer plant-based products to a wider market of consumers.

35. The statements referenced in ¶¶19-34 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a) that Good Foods had lost key managerial personnel following the Acquisition necessary for the successful integration of the acquired OWYN assets, impairing the Company's ability to achieve the Acquisition's purported strategic initiatives and financial and operational targets;

(b) that Good Foods had materially increased its general and administrative spending to compensate for the loss of key managerial personnel, leading to an inefficient and bloated organizational structure and the lack of clear and cohesive strategic priorities for its OWYN segment;

(c) that the addition of a new pea protein supplier for OWYN formulations prior to the Acquisition had created significant product quality issues which had negatively impacted the taste, texture, and shelf-life of OWYN products, leading to negative product reviews, depressed consumer sales, and the loss of important distributor relationships;

(d) that, in an effort to boost sales in the short-term, Good Foods had offered discounts and engaged in other promotional activities for OWYN products above its historical practices, eroding the Company's margins but failing to achieve the desired sales turnaround;

(e) that, in order to stem the margin erosion being suffered in its OWYN segment, Good Foods had cut brand support and marketing for OWYN, further depressing product sales; and

(f) as a result of (a)-(e) above, the Acquisition had largely failed to achieve its key strategic goals, the integration of OWYN had run into severe operational and execution problems, and the business and operational results for the Company's OWYN segment had been materially negatively impacted, undermining the Acquisition's economic rationale.

36. Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in its periodic quarterly and annual financial reports filed with the SEC. Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of these reports, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

37. Under Item 303, given the importance of the Acquisition to the Company's operations and financial prospects, Good Foods' periodic reports were required to describe the known trends and uncertainties arising from its faltering efforts to integrate the acquired OWYN assets. Similarly, under Item 105, these adverse facts should have been disclosed because they created significant risks that made an investment in Good Foods common stock speculative and risky, but were not. Indeed, the boilerplate risk discussions provided in the Company's SEC filings were ***themselves*** materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose the adverse events that had ***already*** transpired and therefore

posed an imminent threat to the Company's business and operations. For example, the "Risk Factors" section of the Company's fiscal 2025 annual report stated that Good Foods "***may*** not accomplish the integration of an acquired business smoothly, successfully or within the anticipated costs or timeframe," but failed to disclose the numerous integration problems stemming from the Acquisition which had ***already*** occurred.

38. On October 23, 2025, Good Foods issued a release reporting financial results for its fourth fiscal quarter and year ending August 30, 2025 ("4Q25 Release"), revealing that the Company's OWYN segment had suffered a slowdown in sales growth. During the related earnings call, Tanner revealed that end user consumption of OWYN branded products had declined due to a previously undisclosed product quality issue. Specifically, Tanner explained that "a raw material sourcing decision for pea protein," which predated the close of the Acquisition but was implemented shortly thereafter, had "resulted in taste and texture issues" as the products aged, leading to negative product ratings and reviews and depressed sales for OWYN. Good Foods also provided disappointing 2026 net sales guidance in the range of negative 2% to positive 2%, a decline in the rate of growth of more than 75% from the 9% net sales growth the Company had reported for fiscal 2025.

39. Following Good Foods' earnings announcement, several analysts commented on the Company's lackluster financial outlook. For example, analysts at TD Cowen described Good Foods' financial guidance as "disappoint[ing]" and "softer than expected," while noting that the "guide-down" for OWYN and Quest "pokes a hole in SMPL'S bull case that strong growth from the two brands can offset structural Atkins declines." Analysts at Morgan Stanley similarly reported that Good Foods' fiscal 2026 sales guidance "came in below expectations," noting that

investor "focus [was] expanding beyond the well-telegraphed Atkins recovery challenges to now include emerging concerns around OWYN following a temporary quality issue."

40. On this news, the price of Good Foods common stock fell from just under $25 per share on October 22, 2025 to $20.63 per share on October 23, 2025, a single day decline of more than 17% on above-average trading volume. However, the price of Good Foods stock remained artificially inflated as defendants failed to disclose the full truth regarding problems arising from the Company's efforts to integrate OWYN and continued to make materially false and misleading statements as detailed herein.

41. For example, the 4Q25 Release stated that Good Foods had generated quarterly revenue of $369 million and quarterly adjusted EBITDA of $66 million in the fourth quarter and was on track to generate negative 2% to positive 2% net sales growth in fiscal 2026. The 4Q25 Release quoted Tanner who represented that Good Foods had "largely completed" its integration of OWYN and claimed the Company had "invested meaningfully" in OWYN and its other brands, stating in pertinent part as follows:

> ***We largely completed the integration of OWYN, invested meaningfully in our brands and capabilities*** despite inflationary pressures, and leveraged our strong cash flow to improve our balance sheet and return cash to shareholders.

42. That same day, Good Foods hosted a conference call with analysts and investors to discuss the Company's operational results for the fourth fiscal quarter and full year, which was hosted by Tanner and Bealer. During the call, Tanner claimed the Acquisition had "enhanced [Good Foods'] presence in the fast-growing ready-to-drink shake segment while positioning [the Company] to become a leader of the rapidly accelerating clean label movement." Tanner further represented that Good Foods' integration of OWYN had now been "largely completed" allowing the Company to leverage its "full scale [] capabilities" to drive growth, including through "significantly stepped up . . . marketing investments," stating in pertinent part as follows:

> ***With the integration largely completed, we will now leverage the full scale and capabilities of Simply Good to drive growth of the business. In fiscal year 2026, this will include significantly stepped up trade and marketing investments I spoke about, in addition to leveraging our retail teams to drive displays, close distribution gaps, and bring highly differentiated innovation to market***.

43. Tanner further insisted that the product quality issues impacting OWYN had been "rectified" and were "mostly in the rear vision mirror." Tanner characterized the product quality issue as a holdover from prior to the Acquisition impacting only a "small portion of product." Tanner claimed that "as soon as [the Company] saw it, we dumped on it" and replaced the deficient product with a "newer and more stable formulation that [has] been shipping since August."

44. Tanner reassured investors that despite the product quality issue, which he portrayed as only a limited and temporary hiccup, the integration of OWYN "ha[d] gone well" and that he remained "extremely confident" in the trajectory of the OWYN business, stating in pertinent part as follows:

> ***We continue to be extremely confident about the trajectory of this business. Strategically, it's expanded our presence in the shake category***. It reaches a new consumer, namely those looking for plant, clean label, feedback from retailers that this is a very distinct incremental segment.
>
> ***The integration has gone well. The synergies are on track***. So this was – this product issue, we've jumped on it. We've dealt with it. But as you do look – as you look forward, I could not be more excited about the OWYN brand. It's the clear leader in clean.

45. When further pressed by an analyst on the OWYN product quality issue, Tanner reiterated that "the product issue is largely behind us." Tanner continued:

> ***I'm confident that this business will be very quickly back to where it was***. And to underscore that, even with the issue in market, ***the brand is growing mid-teens***.
>
> ***As you look long term, again, we have tremendous confidence in this business***. The clean movement is really accelerating. We're hearing it from retailers. ***We're planning on making significant investments in marketing*** to drive awareness from a pretty low base.

> ***We see distribution opportunities in front of us. And I'm really excited about disruptive innovation we'll be bringing out within the next year on the business.***

46. To drive the point home, Tanner summarized the purported success of the Acquisition, stating he was "[c]onfident in the near term, confident in the long term, and we're very pleased we acquired this business." Later, Tanner proclaimed that OWYN's 2026 sales growth "will be in the double-digit range."

47. On October 28, 2025, Good Foods filed its annual report on Form 10-K with the SEC, which was signed by Tanner and Bealer. Tanner and Bealer also provided certifications attesting to the report's accuracy and completeness. The report highlighted the Acquisition, claiming Good Foods acquired OWYN as part of its strategic "vision" to "lead" the nutrition industry, stating:

> ***We acquired OWYN as a part of our vision to lead the nutritious snacking movement with trusted brands*** that offer a variety of convenient, innovative, great-tasting, better-for-you snacks and meal replacements that will now offer plant-based products to a wider market of consumers.

48. On January 8, 2026, Good Foods issued a release reporting financial results for its first fiscal quarter ending November 29, 2025 ("1Q26 Release"). The 1Q26 Release stated that Good Foods had generated quarterly revenue of $340 million and quarterly adjusted EBITDA of $55 million. The 1Q26 Release stated that Good Foods remained on track to achieve between negative 2% to positive 2% fiscal 2026 net sales growth.

49. That same day, Good Foods hosted a conference call with analysts and investors to discuss the Company's results for the first fiscal quarter, which was hosted by Tanner and Bealer. During his prepared remarks, Tanner represented that Good Foods was "well positioned" within the nutritional snacking category and claimed the Company had a "strong foundation" for "sustainable" revenue growth.

50. When asked about competition in the RTD category, Tanner highlighted the fact that the "the category is still growing 10% plus" and OWYN was purportedly "very uniquely positioned within that category." Tanner continued, "[i]t's not just another RTD milkshake or chocolate or strawberry flavor, it is positioned as the leading clean and plant-based proposition in the market, very differentiated. Retailers see that, consumers see that, so I feel very confident." After highlighting RTD initiatives across Good Foods' brands, Tanner stated, "[s]o we believe that we have three very differentiated positions -- differentially positioned brands inside a category that's still robust, still growing double-digit. So we have a lot of confidence in the future growth here."

51. Also on January 8, 2026, Good Foods filed its quarterly report on Form 10-Q with the SEC. Tanner and Bealer provided certifications attesting to the report's accuracy and completeness. The quarterly report contained the same financial information regarding Good Foods' revenue and adjusted EBITDA as stated in the 1Q26 Release.

52. The statements referenced in ¶¶41-51 above were materially false and/or misleading when made because they failed to disclose the adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as set forth in ¶35.

53. Then on April 9, 2026, Good Foods announced its second quarter of 2026 earnings results, revealing that consumer consumption had plummeted across all of the Company's brands. Most notably, rather than the double-digit growth previously highlighted, OWYN's quarterly sales had ***contracted by nearly 17%*** year-over-year. Good Foods further revealed a $187 million impairment charge against its OWYN brand intangible assets and slashed its 2026 net sales outlook to a range of negative 7% to negative 10%.

54. During the corresponding conference call, returning CEO Scalzo (who had recently replaced Tanner) acknowledged the abysmal results and admitted that the Company had "made some strategic choices" that "ultimately weakened" the performance of its brands, including OWYN. Scalzo expanded by stating that the Company's "[s]trategy shifted, priorities were not always clear and execution did not consistently meet the standard required to compete." Scalzo identified several "structural issues" which had hamstrung the business, including excessive general and administrative bloat, underinvestment in brands and marketing, overreliance on short-term discounting to boost growth, and various inefficiencies, stating:

> Since returning to the role, I have focused on taking a clear-eyed assessment of the business to ensure that we have the discipline, the consistency and the operational excellence required to compete and win. This work is already well underway, and we are acting with a sense of urgency. Before moving to our portfolio, I believe it's worth stepping back and highlighting a few structural issues within the business that have contributed to our recent performance.
>
> Over the past several years, we've experienced erosion in overall household fundamentals across the portfolio. In a category like ours, growth ultimately depends on continually recruiting new consumers into our brands while growing loyalty and buy rate.
>
> Consumer recruitment requires the proper economic structure in the business. For us, this was characterized by gross margins approaching 40%, with sustained marketing investment around 10% of sales, and adjusted EBITDA margins approaching 20%.
>
> The shape of our P&L has moved far in this ideal structure with gross margins in the middle 30s, reductions in marketing spend as a percent of sales and G&A dollars growing faster than underlying business. As a result, our ability to consistently invest behind our brands has been constrained which has ultimately led to slower household penetration growth, declining buy rate and pressure on brand performance. To succeed, we will address these structural issues.
>
> Our turnaround beliefs moving forward are clear. We will relentlessly act in efficiency in our supply chain. We will use pricing action as necessary to help offset cost inflation over time. We will be less reliant on price promotion. We will lower our fixed overhead structure while improving key areas of functional expertise. We will restore more consistent investment behind our brands. We'll focus more of our brand innovation on the core business with bigger consumer-

> driven ideas. And we will use ROI to evaluate the effectiveness of every marketing investment.

55. In particular, Scalzo highlighted the reasons behind the deterioration in the Company's OWYN business. Contrary to defendants' Class Period representations that the integration of OWYN had "gone well," Scalzo revealed that the integration of the business had, in fact, failed to meet the Company's "own expectations," leading to poor market execution, retail misses, and distribution losses, stating in pertinent part as follows:

> While the growth opportunity with OWYN is compelling, ***we did not meet our own expectations with the integration of the brand into our company. As a result, we lost some important brand expertise, our marketplace execution was poor and our brand performance fell well short of our plans***.

56. Scalzo also revealed that the product quality issues impacting OWYN were more pervasive than previously disclosed, stating that product deficiencies had hurt sales for the Company's Pro Elite 32-gram protein shake, its new entrant into the high-protein RTD market. Scalzo explained that the "combination of a product quality issue on that product [had] impacted taste, texture and consumer acceptance and poor marketing execution negatively impacted performance during the critical expansion window." Far from already being "rectified" in October 2025 as previously claimed by Tanner, Scalzo revealed that the lingering effects of OWYN's product quality issues were expected to lead to "some near-term distribution losses ***over the next year***" – *i.e.*, into at least early calendar 2027.

57. On this news, the price of Good Foods common stock declined from $14.41 per share on April 8, 2026 to $10.44 per share on April 10, 2026, a decline of more than 27% over a two-day trading period, on above-average volume.

58. In an April 22, 2026 report, analysts at TD Cowen provided additional information regarding the integration issues stemming from Acquisition following a meeting with Scalzo. The analysts reported that "[a] lot" had gone wrong with the integration as the Good Foods executive

leadership team had "lost touch with the business and set up the organization with too much bureaucracy and too many priorities." The analysts further reported that these organizational changes followed the loss of key management personnel which had "compromised the integration . . . and execution." Making matters worse, after "margins collapsed" management attempted to save costs by "cutting brand support," ultimately causing OWYN household penetration levels to decline.

59. On July 9, 2026, Good Foods reported the Company's financial results for its third fiscal quarter ending May 30, 2026. In connection with reporting these results, the Company revealed an additional $13 million impairment of its OWYN assets, bringing cumulative impairments for the brand to $200 million – ***70% of the purchase price less than two years after the Acquisition closed***. In the related earnings call, Scalzo acknowledged the severity of the Company's problems following the Acquisition, stating, "[i]mportantly, we remain in the early stages of our turnaround and have significant work ahead." Scalzo continued:

> Turning to OWYN retail takeaway declined 1.3% in the third quarter, compared to a decline of 2.4% last quarter. . . . As we reported last quarter, ***the combination of a product quality issue and ineffective marketing execution negatively impacted performance on a number of OWYN products***.
>
> We have addressed the product issue but do ***expect distribution losses over the next six to 12 months because of poor marketplace performance***. . . .
>
> ***We believe the challenges we are addressing stem primarily from integration and execution issues*** rather than a lack of consumer demand for clean label plant-based nutrition.

60. As a result of the revelations detailed herein, the price of Good Foods shares has declined more than 70% from Class Period highs of more than $40 per share to lows of less than $11 per share by Class Period end, causing investors to suffer substantial financial losses and economic damages under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

61. Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Good Foods common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

62. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Good Foods common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Good Foods or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

63. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

64. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

65. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether defendants' statements during the Class Period were materially false and misleading;

(b) whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c) the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

66. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

67. As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the Class Period to the investing public in the name of the Company, or in their own name, were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Good Foods, and their control over and/or receipt and/or modification of Good Foods allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

68. Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The Individual Defendants, because of their positions with Good Foods, controlled the contents of Good Foods' public

statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, nonpublic information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the defendants is responsible for the accuracy of Good Foods' corporate statements and is, therefore, responsible and liable for the representations contained therein.

69. Good Foods' integration of OWYN, brand support, and product performance were among the most important issues facing the Company and the focus of Good Foods management, including the Individual Defendants. For example, during a July 10, 2025 earnings call, Tanner claimed to have a "clear line of sight" into the purported "gains coming over the summer and into the fall" boosting OWYN results, but failed to disclose the product quality issues then negatively impacting OWYN sales. Similarly, during the Company's October 23, 2025 earnings call, Tanner claimed the product quality issues impacting OWYN were already "rectified" and represented that the integration of OWYN had been "largely completed" and "gone well." The close proximity of these representations to the subsequent April 2026 admissions by Tanner's replacement as CEO, Scalzo, that the product quality issues were far more pervasive than admitted to by Tanner, with lingering negative impacts expected to last until calendar 2027, and that the integration had, in fact, failed to meet the Company's "own expectations," suggests a clear intent to deceive. Moreover, defendants chose to engage in increased promotional activities and reduce marketing support for OWYN products in a failed attempt to remediate undisclosed operational problems

caused by the Acquisition, rather than timely reveal to investors the true state of integration efforts, further suggesting conscious awareness of the concealed facts detailed herein.

70. Finally, several senior Good Foods executives left the Company during the Class Period or soon thereafter, including Tanner (President, CEO, and Director), Mara (CFO), Timothy Matthews (Chief Accounting Officer), Amy Held (Senior Vice President and Chief Human Resource Officer), and Jill Short (Chief Customer Officer). The sudden departure of Tanner is particularly notable. As the principal architect of the Acquisition, Tanner was under tremendous pressure to demonstrate that the Acquisition had been a success. This spate of executive departures contemporaneous with the problems suffered by the Company in connection with the Acquisition bolsters an already compelling inference of scienter.

## LOSS CAUSATION

71. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Good Foods common stock and operated as a fraud or deceit on Class Period purchasers of Good Foods common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Good Foods common stock declined significantly as the prior artificial inflation came out of the price of the stock, as detailed herein. As result of their purchases of Good Foods common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

72. At all relevant times, the market for Good Foods common stock was an efficient market for the following reasons, among others:

(a) Good Foods common stock met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b) as a regulated issuer, Good Foods filed periodic public reports with the SEC;

(c) according to the Company's Form 10-K for the fiscal year ended August 30, 2025, Good Foods had nearly 100 million shares of common stock outstanding as of October 17, 2025;

(d) Good Foods regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e) unexpected material news about Good Foods was rapidly reflected in and incorporated into prices for Good Foods common stock during the Class Period.

73. As a result of the foregoing, the market for Good Foods common stock promptly digested current information regarding Good Foods from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Good Foods common stock during the Class Period suffered similar injury through their purchases of Good Foods common stock at artificially inflated prices and a presumption of reliance applies.

74. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions. Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to

recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

75. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Good Foods who knew that those statements were false when made.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

76. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they

contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Good Foods common stock during the Class Period.

79. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Good Foods common stock. Plaintiff and the Class would not have purchased Good Foods common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

80. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Good Foods common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

81. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82. During the Class Period, defendants acted as controlling persons of Good Foods within the meaning of §20(a) of the 1934 Act. By virtue of their positions and their power to control public statements about Good Foods, the Individual Defendants had the power and ability to control the actions of Good Foods and its employees. Good Foods controlled the Individual Defendants and all of its other officers and employees. For these reasons detailed herein, each of the Defendants was a culpable participant in the fraudulent scheme alleged herein. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: August 14, 2026

s/ Samuel H. Rudman

SAMUEL H. RUDMAN

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
BRIAN E. COCHRAN
FRANCISCO J. MEJIA
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
bcochran@rgrdlaw.com
fmejia@rgrdlaw.com

Attorneys for Plaintiff

VMT LAW, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
tmichaud@vmtlaw.com

Additional Counsel

# CERTIFICATION OF NAMED PLAINTIFF
# PURSUANT TO FEDERAL SECURITIES LAWS

Monroe County Employees' Retirement System ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Brownback v. AppLovin Corporation*, No. 4:25-cv-02772 (N.D. Cal.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of August, 2026.

Monroe County Employees' Retirement System

By: [signature]

Its: Chairman

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Common Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 05/14/2025 | 298 | $35.55 |
| 05/15/2025 | 506 | $35.95 |
| 05/15/2025 | 507 | $35.66 |
| 10/15/2025 | 380 | $24.21 |
| 10/15/2025 | 2,073 | $24.30 |
| 10/16/2025 | 2,749 | $24.81 |
| 10/24/2025 | 564 | $20.94 |
| 10/24/2025 | 2,266 | $21.05 |
| 02/12/2026 | 709 | $15.89 |
| 02/13/2026 | 3,366 | $16.01 |
| 02/25/2026 | 2,008 | $16.66 |

Prices listed are rounded to two decimal places.